# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1288

_____

| | | |
|---|---|---|
| Deborah Eich, | * | |
| | * | |
| Plaintiff-Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Board of Regents for Central Missouri | * | |
| State University, Department of Public | * | |
| Safety, | * | |
| | * | |
| Defendant-Appellee. | * | |

_____

Submitted: September 10, 2003

Filed: December 4, 2003

_____

Before MELLOY, LAY, and SMITH, Circuit Judges.

_____


LAY, Circuit Judge.


This is a case involving the question of human decency. The appeal involves a hostile work environment claim based on the sexual harassment of a female employee brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, and the Missouri Human Rights Act, Mo. Rev. Stat. §§ 213.010-213.137.

Deborah Eich was employed by the Department of Public Safety for Central Missouri State University ("CMSU") as a detective sergeant. She filed suit against CMSU, alleging that she suffered from a hostile work environment due to sexual harassment by two co-workers, Brad Drake and Richard Gillespie. She also alleged that CMSU unlawfully retaliated against her for complaining about the harassment.

A jury found in Eich's favor on her hostile work environment sexual harassment claim and awarded her $200,000 in non-economic damages and $42,272.08 in economic damages. The jury also found in Eich's favor on her retaliation claim but did not award any damages. The district court granted CMSU's motion for judgment as a matter of law on Eich's sexual harassment and retaliation claims and set aside the jury's award of $42,272.08 in economic damages as not being supported by Eich's hostile work environment sexual harassment claim. In the alternative, the district court ordered that Eich must accept remittitur of the non-economic damages from $200,000 to $10,000 or CMSU was to be granted a new trial. Deborah Eich appeals. We reverse.

## I. FACTS

Eich began working for the CMSU Department of Public Safety ("Department") as a dispatcher in 1984. In 1993, she was promoted to the position of detective sergeant. Brad Drake began working for the Department as a road patrol officer in 1987 and was promoted to the position of evening shift sergeant in July 2000. Richard Gillespie began working as police operations commander at the Department in 1993. Gillespie initially had an indirect supervisory role in relation to Eich, but he became her direct supervisor in May of 2000.

Eich first began experiencing problems with Drake in the late 1980s. Drake brushed up against her breasts during in-house training sessions and frequently ran his fingers through her hair, rubbed her shoulders, and ran his finger up her spine. Eich testified that she observed Drake touching the hair and rubbing the shoulders of

-2-

other female employees. Frances Behm, a female employee in the Department, testified that Drake rubbed her shoulders and touched her hair. Drake often stopped by Eich's office and told her how pretty she was and asked her to run off with him somewhere. There was testimony that these types of innuendos occurred frequently.

On more than one occasion, during handcuff training sessions, Drake stood behind Eich and simulated a sexual act while Eich was bent over and handcuffed as part of the training. Eich testified that she observed Drake simulate a similar sexual act with another female officer during a handcuff training session. During other training sessions in the presence of Eich, Drake simulated sexual acts with a nightstick by sliding the stick in and out of his hand.

Eich and Drake were required to attend two out-of-town training sessions together in 1997 and 1999. During the 1997 training session in Arkansas, Eich and Drake were required to share a piece of equipment in order to complete their training homework. Although Eich and Drake worked on their homework separately, on at least one occasion, Drake asked Eich to help him with a problem he was having with the equipment. When Eich went to Drake's room to help, Drake commented that Eich's nipples were hard because she had gotten cold by going outside.

At the 1999 training session in Branson, Missouri, Drake grabbed at Eich's leg, touched her hair, and attempted to look down her blouse when she tried to retrieve a pencil he had dropped. Drake's conduct drew the attention of the training session instructor who approached Eich at a break and asked if she wanted Drake removed from the training session. Eich testified that she was humiliated and embarrassed by the incident as she was trying to project a professional image and had been asked to serve on the board of directors of the organization sponsoring the training.

Eich's problems with Gillespie began shortly after he started working for the Department in 1993. Gillespie often made comments about Eich's body, hair, and

face, telling her she had a pretty face and pretty hair. Eich testified that Gillespie talked with her about the appearance of other female employees, and Eich once overhead Gillespie comment on the chest size of Eich and another female officer after they had been measured for bulletproof vests.

Gillespie spent hours sitting in Eich's office talking about various topics, some work-related and others personal. Other employees teased Eich about the amount of time Gillespie spent in her office, suggesting that she was "messing around with the boss." A running joke was that the chair in front of Eich's desk was "Richard's Chair."

Gillespie rubbed his hand up and down Eich's leg during meetings and rubbed or pressed up against her while they talked. On several occasions, Gillespie stood behind Eich while she sat at her computer and pressed his groin area into her shoulder. Gillespie once stated in the presence of Eich and other officers that it was so cold that he had to fish around in his pants to find "it" in order to go to the bathroom. On another occasion, Gillespie stated in the presence of Eich and another officer about giving an individual arrested for child molestation a jar of Vaseline to take to prison with him.

According to Eich, between 1993 and 2000, she reported her concerns about Drake and Gillespie's behavior numerous times (at least sixteen of which she had documented) to Chief Huff, the Director of Public Safety at CMSU. Eich also reported her concerns to Drake's supervisor, CMSU's director of human resources, and CMSU's affirmative action employment opportunity officer. Despite these numerous reports, Drake and Gillespie's objectionable conduct continued until Eich went on administrative leave in January 2001. Eich testified that in the year prior to her administrative leave some form of harassing behavior by Drake or Gillespie was occurring on an almost daily basis.

-4-

Eich testified that Gillespie would treat her poorly and criticize her job performance when she would ask Gillespie to leave her office or complain to Chief Huff about Gillespie's behavior. Eich alleges that CMSU retaliated against her for complaining of the sexual harassment. The basis of this allegation involves a market adjustment raise Eich expected to receive in 2000.

In July 1999 and 2000, Eich received the standard pay raise CMSU gave its employees. In November 1999, Eich received an additional raise of $1,057 per year to account for an internal pay discrepancy among three sergeants in the Department. In July 2000, three shift sergeants in the Department received a market adjustment raise in addition to CMSU's standard pay raise. The three shift sergeants who received the market adjustment raise were all senior in rank to Eich and had different job duties.

Eich did not receive the market adjustment raise in July 2000, despite her testimony that Chief Huff had promised she would receive the raise. Chief Huff testified that Eich did not receive the market adjustment raise because she had received the additional raise in November 1999 and had some job performance problems.

Eich's job responsibilities included following investigations, compiling reports, logging evidence into the evidence room, and making an inventory of evidence. She also sent case summaries to the prosecutor's office to request that someone be charged with a crime. She was required to send a fingerprint card to the prosecutor when a charge was requested. Regarding Eich's job performance problems, Chief Huff testified that Eich failed to move thirty-three drug cases forward to the prosecutor, causing some to exceed the statute of limitations, and missed a work assignment in April 2000. Eich testified that she was prevented from moving the drug cases forward because patrol officers in the Department failed to provide a required fingerprint card for each of the cases. She also offered into evidence the

work schedule for the month of April 2000, showing she had not been assigned or made aware of the missed work assignment. In May of 2000, Eich was placed on a job performance improvement plan to address her job performance issues.

Eich filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and Missouri Commission on Human Rights on January 2, 2001. She was granted fully-paid administrative leave from February 2001 to November 2001. CMSU conducted an internal investigation of Eich's complaints and concluded that no sexual harassment occurred. At the conclusion of its investigation, CMSU asked Eich to return to work but stipulated her reinstatement was to be with no substantial changes in the working conditions. Eich was unwilling to return to work under the existing conditions, and her employment was terminated in November 2001.

## II.  TITLE VII ("Sexual Harassment")

The history of sexual harassment in the workplace was initially premised on the interpretation of Title VII as found in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986). In defining "sexual harassment" under Title VII, the Supreme Court followed the EEOC regulation (29 CFR § 1604.11(a) (1985)) that actionable workplace conduct may include "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Meritor*, 477 U.S. at 65. The Supreme Court quoted with approval from the Eleventh Circuit's decision in *Henson v. City of Dundee*, 682 F.2d 897, 902 (11th Cir. 1982):

> Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality. Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets.

*Meritor*, 477 U.S. at 67.

The Court noted that a single use of an ethnic or racial epithet which engenders offensive feelings in an employee would not affect the conditions of employment enough to violate Title VII. *Id.* The Court observed that to be actionable, sexual harassment "must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Id.* The Supreme Court rejected the contention that Title VII was limited only to economic or tangible discrimination and held that a sexual harassment claim can rest exclusively on a "hostile environment" theory. *Id.* at 64, 66. Thereafter, the Supreme Court followed with two decisions relating to the liability of the employer. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

The most significant case in this series of cases by the Supreme Court is *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993). The Court recognized that "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . Title VII is violated." *Id.* at 21 (internal citations and quotations omitted). The Court pointed out that this standard

> takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury. . . . Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview.

*Id.* However, more relevant to Eich's present appeal, the Court observed:

-7-

But Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality. The appalling conduct alleged in *Meritor*, and the reference in that case to environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers, merely present some especially egregious examples of harassment. They do not mark the boundary of what is actionable.

*Id.* at 22 (internal citations and quotations omitted). Thus, the Court in reversing the court of appeals held "[s]o long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious." *Id.* (internal citation omitted). The Court pointed out that this is not "a mathematically precise test" and that before one can say an environment is hostile or abusive, one must look at all the circumstances. *Id.* at 22-23. The Court observed:

These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive.

*Id.* at 23.

One of the leading sexual harassment cases in this circuit is *Hathaway v. Runyon*, 132 F.3d 1214 (8th Cir. 1997). The facts as demonstrated in the opinion set forth the circumstances under which a suit can be determined to be sufficiently severe or pervasive to submit the factual evidence to the jury.

The court in *Hathaway* made the following factual summary of the evidence:

> Hathaway was physically touched in a sexually suggestive and intimate manner on two occasions by a coworker who had expressed a sexual interest in her. After she rebuffed his advances, Norris and his friend Wynn proceeded to laugh, snicker, and make suggestive noises at her for a period of eight months. This treatment frightened and intimidated Hathaway. She feared that Norris would fondle her again or undermine her work performance which he and Wynn did by wrongly reporting her for mislabeling mail. She testified that she was terrified to pass within grabbing range of either Norris or Wynn and that she felt trapped when they blocked her exit from the narrow label room. The jury heard Hathaway reproduce the noises that disturbed her, and it credited her position that this pattern of behavior created a hostile work environment related to Norris' earlier advances. *See Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 780-83 (10th Cir. 1995) (a few incidents of unwelcome physical touching combined with winks and intimidating stares with possible sexual overtones is sufficient to establish a hostile environment).

132 F.3d at 1222. In reversing the district court's judgment as a matter of law, the *Hathaway* court observed:

> Evidence of conduct that creates a workplace permeated with "discriminatory intimidation, ridicule, and insult" establishes a hostile environment claim under federal law. Title VII does not, however, create a cause of action for all unpleasant or abusive behavior in the workplace. Rather, the plaintiff must show that the conduct was discriminatory in nature and that she was singled out for such treatment

on the basis of her membership in a protected category under the statute. In conducting its fact-based inquiry into the severity and pervasiveness of the conduct and into whether it was based on sex, the jury looks at all the circumstances supported by credible evidence. . . .

. . . Justice Scalia pointed out in his concurring opinion [in *Harris*] that since Congress set no clear standard defining a hostile environment, it must be left to "virtually unguided juries" to decide whether particular conduct is "egregious enough" to merit an award of damages. There is no bright line between sexual harassment and merely unpleasant conduct so a jury's decision must generally stand unless there is trial error.

*Id.* at 1221. (internal citations omitted). The court further observed:

A work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it "into a series of discrete incidents." *Burns v. McGregor Elec. Indus., Inc.*, 955 F.2d 559, 564 (8th Cir. 1992). Although the district court correctly stated that the inference had to be drawn that the pattern of conduct presented in this case was all related, it did not proceed to review the sufficiency of the evidence in that light. The humiliating and intimidating effect of the snickers and noises on Hathaway could have been interpreted by the jury to be caused by the nexus between that behavior and Norris' earlier sexual overtures. *See King v. Hillen*, 21 F.3d 1572, 1583 (Fed. Cir. 1994) (plaintiff's perception of any one incident of harassment should be determined in the context of all incidents (citing 29 C.F.R. § 1604.11(b))). The jury could reasonably have decided on the basis of this interpretation of the evidence that Hathaway was the victim of menacing sex-based treatment that stemmed from her rejection of Norris' sexual interest in her.

*Id.* at 1222.

In the present case, we emphasize the sexual touching and sexual innuendos made in Eich's presence over a continuous period of time. Her attempts to rebuff this harassment by reporting to her superiors was to no avail. We hold the facts as presented by this record, continuing over a period of seven years and involving numerous touchings and sexual innuendos, were sufficient for the jury to conclude that Deborah Eich was subjected to sexual harassment sufficiently severe or pervasive to establish a hostile work environment. The record here demonstrates the overall circumstances are much more egregious than those set forth in *Hathaway*.[1]

---

[1]This court has been almost uniform in finding similar abusive conduct in various workplaces to be actionable. *See, e.g., Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 616-17 (8th Cir. 2000) (holding sufficient evidence supported jury's verdict for plaintiff where she was subjected to a verbal barrage of crude sexual vulgarities, physical touching in a sexually offensive manner, and obscene hand gestures); *Breeding v. Arthur J. Gallagher and Co.*, 164 F.3d 1151, 1159 (8th Cir. 1999) (reversing summary judgment for employer where supervisor "fondled his genitals in front of" a female employee and "used lewd and sexually inappropriate language"); *Rorie v. United Parcel Service, Inc.*, 151 F.3d 757, 762 (8th Cir. 1998) (concluding work environment where a supervisor pats female employee on the back, brushes up against her, and tells her she smells good could create a hostile work environment); *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 838-41 (8th Cir. 1998) (finding sufficient evidence to support jury's verdict where female employees were subjected to sexual innuendos, sexual touching, and other unwelcome sexual remarks); *Smith v. St. Louis Univ.*, 109 F.3d 1261, 1264-65 (8th Cir. 1997) (holding district court incorrectly granted summary judgment on hostile work environment sexual harassment claim given evidence of frequent and regular derogatory comments toward plaintiff and other female employees); *Kopp v. Samaritan Health Sys., Inc.*, 13 F.3d 264, 266-69 (8th Cir. 1993) (finding evidence of abusive conduct, including shouting and swearing at female employees and using vulgar names, sufficient to preclude summary judgment for employer); *Burns v. McGregor Elec. Indus., Inc.*, 989 F.2d 959, 965 (8th Cir. 1993) (finding Title VII clearly violated where owner of company repeatedly asked plaintiff for a sexual relationship and where other employees called plaintiff crude names and harassed her over her nude depiction in a national magazine); *Hall v. Gus Const. Co.*, 842 F.2d 1010, 1012-14 (8th Cir. 1988) (finding conduct involving crude names and other verbal abuse, requests to engage

It is understandable that the district court and the Defendant in the present case rely on *Duncan v. General Motors Corp.*, 300 F.3d 928 (8th Cir. 2002), a case in which this court has held that certain sexual harassment was not severe or pervasive enough to sustain the jury's verdict for the plaintiff. In *Duncan*, the majority of the court found that "Duncan's working conditions were certainly not ideal and in many instances the environment that Duncan endured at GMC was offensive and disrespectful. . . ." *Id.* at 935. Nonetheless, the court, over the strong dissenting opinion of Judge Richard S. Arnold, found that the conditions did not constitute "a sexually harassing hostile environment sufficiently severe or pervasive so as to alter the conditions of [Duncan's] employment. . . ." *Id.*

Each case must stand on its own circumstances. Our panel, in holding as we do, must rely solely upon what the *Duncan* majority's opinion reflects as being the facts of the case. The majority in *Duncan* reasoned that although the actions of Duncan's co-worker Booth were "boorish, chauvinistic, and decidedly immature," they did not create a hostile work environment permeated with sexual harassment. *Id.* The court observed that Duncan presented evidence of only four categories of harassing conduct based on her sex: a single request for a relationship, four or five isolated incidents of Booth briefly touching her hand (something Booth did to all

_____

in sexual acts, offensive and unwelcome physical touching of thighs and breasts to be sufficiently severe or pervasive to support hostile work environment claim).

male and female employees), a request to draw a planter,[2] and teasing in the form of a poster and beliefs for an imaginary man hater's club.[3]  *Id.*

In the present case, as the detailed facts clearly demonstrate, Eich experienced more than the mere touching of the hand.  On several occasions, Drake brushed up against her breasts, and frequently ran his fingers through her hair, rubbed her shoulders, and ran his finger up her spine.  On more than one occasion he stood behind Eich and simulated a sexual act while Eich was bent over during handcuff training sessions.  In the presence of Eich, the same officer simulated sexual acts with a nightstick by sliding the stick in and out of his hands and constantly rendered sexual innuendos directed to her and other female employees in the Department.  Eich testified that Gillespie rubbed his hand up and down her leg, brushed up against her when they spoke, and pressed his groin into her shoulder while standing behind her.

Eich was subjected to a long series of incidents of sexual harassment in her workplace which went far beyond "gender related jokes and occasional teasing." *See Faragher*, 524 U.S. at 788.  We have held that "[o]nce there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury." *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840.

_____

[2]The planter contained an obvious sexual innuendo.  Booth kept the planter in his office and it was shaped like a slouched man wearing a sombrero.  It had a hole in front of the man's pants that allowed for the cactus to protrude.  The court pointed out that the planter was in plain view of anyone entering Booth's office.  *Duncan*, 300 F.3d at 931.

[3]In *Hathaway*, there were only two isolated touching incidents, i.e., pinching her and hitting her on the buttocks with a clipboard.  *Hathaway*, 132 F.3d at 1217.  Yet, our court held the facts in *Hathaway* to be sufficiently abusive and those in *Duncan* to fall short of that standard.  As we have indicated, the facts in the present case are more egregious than those in *Hathaway*.

We find the district court clearly erred in granting judgment as a matter of law under the evidence submitted to the jury in the present case. The discussion in *Hathaway, supra*, well-summarizes the narrow circumstance under which a district court may grant a judgment as a matter of law in overturning a jury verdict:

> The law places a high standard on overturning a jury verdict. Judgment as a matter of law is proper only when there is a complete absence of probative facts to support the conclusion reached so that no reasonable juror could have found for the nonmoving party. On such a motion the court must assume as proven all facts that the nonmoving party's evidence tended to show, give her the benefit of all reasonable inferences, and assume that all conflicts in the evidence were resolved in her favor. The grant of a motion for judgment as a matter of law will only be affirmed when all the evidence points in one direction and is susceptible to no reasonable interpretation supporting the jury verdict. The question of whether there is sufficient evidence to support a jury verdict is a legal one, and the district court's decision to grant a motion for judgment as a matter of law is therefore reviewed de novo.

*Hathaway*, 132 F.3d at 1220-21 (internal citations and quotations omitted).

In summarizing our reversal in this appeal, we note our statement made in *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287 (8th Cir. 1997):

> It should be obvious that the callous pattern and practice of sexual harassment engaged in by Eveleth Mines inevitably destroyed the self-esteem of the working women exposed to it. The emotional harm, brought about by this record of human indecency, sought to destroy the human psyche as well as the human spirit of each plaintiff. The humiliation and degradation suffered by these women is irreparable. Although money damage cannot make these women whole or even begin to repair the injury done, it can serve to set a precedent that in the environment of the working place such hostility will not be tolerated.

-14-

*Id.* at 1304.  In *Jenson*, we dealt with a series of complaints by several female employees.  What we concluded as to those employees in the *Jenson* case applies singularly to Deborah Eich and any other woman who is subjected to sexual harassment in the workplace.  Men and women have every right to be left alone without sexual abuse in the workplace.  This case, as well as well as others, point out the need for employers to set up training sessions to avoid repetition of the kind of claims made here so that the workplace does not become a hostile work environment. *See Davis v. Tri-State Mack Distrib., Inc.*, 981 F.2d 340, 344 (8th Cir. 1992).  Rather than ignoring complaints of sexual harassment made by female or male employees, employers should take notice that they are not only condoning the psychological harm to their employees, but they are creating a loss of work efficiency within their own work environment.  We express this court's condemnation of sexual abuse in the workplace and continue to express hope that employers will strive to create a changed environment such that men and women of every race, color, or creed can feel free to work without a hostile environment.

### III.  DAMAGES

Under Eich's sexual harassment claim, the district court submitted to the jury a form of jury verdict in which the jury found in Eich's favor and awarded non-economic damages in the sum of $200,000 and economic damages in the sum of $42,272.08.  On another form of verdict, the jury found in favor of Eich under her retaliation claim but returned the verdict for no damages.  The district court entered an order granting judgment as a matter of law in favor of CMSU on all claims.  The district court also vacated the economic damages awarded under the sexual harassment claim on the ground that Eich had not pleaded constructive discharge under this claim.  The district court found that Eich had pleaded constructive discharge only under her retaliation claim.  However, the district court overlooked the fact that in submitting the verdict form on the sexual harassment claim, it allowed the jury to find both economic and non-economic damages in favor of Eich.

The district court in instructing the jury on damages failed to differentiate between the economic damages to be awarded under the sexual harassment claim and the claim for retaliation. CMSU did not object to the form of the verdict. We can only assume, but need not do so, that a reason for not awarding economic damages under the retaliation claim was because it would have been duplicitous to the economic damages already awarded to the Plaintiff under the sexual harassment claim. Notwithstanding the pleadings, we view the court's inclusion of the economic damages in its instructions under the sexual harassment claim and CMSU's failure to object to the instruction to be such that the issue was tried by the consent of the parties. Fed. R. Civ. P. 15(b); *Clark v. Martinez*, 295 F.3d 809, 815 (8th Cir. 2002). Accordingly, the verdict for economic damages must stand.

## IV. RETALIATION

The evidence clearly supported the finding of liability of the Defendant on the retaliation claim. On this basis, although no damages were allowed, we direct the district court to reinstate the verdict in favor of Eich on the retaliation claim. Thus, we hold the district court clearly erred in granting judgment as a matter of law for the Defendant.

## V. REMITTITUR

The jury awarded Eich $200,000 for non-economic damages, relating to the emotional distress she suffered as a result of Drake and Gillespie's actions and CMSU's inaction. The district court granted judgment as a matter of law on the sexual harassment claim but ruled in the alternative that if it were reversed, Eich must accept a remittitur of the non-economic damages to $10,000 or face a new trial. We reverse and reinstate the jury's verdict.

In this circuit, a district court should order remittitur "only when the verdict is so grossly excessive as to shock the conscience of the court." *Ouachita Nat'l Bank v. Tosco Corp.*, 716 F.2d 485, 488 (8th Cir. 1983). A verdict is not considered

-16-

excessive unless there is "plain injustice" or a "monstrous" or "shocking" result. *Jenkins v. McLean Hotels, Inc.*, 859 F.2d 598, 600 (8th Cir. 1988).

This court has consistently held that "awards for pain and suffering are highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms." *Frazier v. Iowa Beef Processors, Inc.*, 200 F.3d 1190, 1193 (8th Cir. 2000); *see also Jenkins*, 859 F.2d at 600; *Morrissey v. Welsh Co.*, 821 F.2d 1294, 1299 n.3 (8th Cir. 1987) ("We adhere to the belief that a jury is the best-equipped entity to determine the size of a damage award."); *Stafford v. Neurological Med., Inc.*, 811 F.2d 470, 475 (8th Cir. 1987) (assessment of damages especially within a jury's discretion when damages are not easily calculable in economic terms); *Vanskike v. Union Pac. R.R. Co.*, 725 F.2d 1146, 1150 (8th Cir. 1984) ("Assessment of damages is within the sound discretion of the jury.").

This court has considered the excessiveness of jury awards for emotional distress in several cases involving claims under Title VII. For example, in *Kucia v. Southeast Arkansas Community Action Corp.*, 284 F.3d 944, 947-48 (8th Cir. 2002), we upheld $50,000 in compensatory damages for emotional distress in a race discrimination case where the plaintiff testified that it was hard for her to hold her head up, that she was on edge, and that she had lost sleep and felt anxious. We held that $50,000 was not so excessive as to shock the judicial conscience. *Id.* at 948. Similarly, in *Ross v. Douglas County, Nebraska*, 234 F.3d 391, 397 (8th Cir. 2000), we ruled that $100,000 for emotional distress in a race discrimination case was not excessive where the plaintiff suffered emotional and physical injuries and was forced to take a lower paying job without health benefits. Also, in *Kientzy v. McDonnell Douglas Corp.,* 990 F.2d 1051, 1061-62 (8th Cir. 1993), we upheld an award of $125,000 for mental anguish and suffering and held that the district court did not abuse its discretion in failing to remit the award.

The court has upheld varying amounts of emotional distress damages in cases not involving Title VII. *See, e.g., Mathieu v. Gopher News Co.*, 273 F.3d 769, 782-83 (8th Cir. 2001) (finding $165,000 emotional distress award not excessive where plaintiff in ADA claim was only witness to testify about emotional distress); *Foster v. Time Warner Entm't Co.*, 250 F.3d 1189, 1196 (8th Cir. 2001) (holding $75,000 award for emotional distress in ADA claim was not excessive where plaintiff and her husband testified that plaintiff had become withdrawn, could not eat, experienced back pain and other physical and emotional problems); *Frazier*, 200 F.3d at 1193 (8th Cir. 2000) (upholding $40,000 award in FMLA claim where plaintiff testified he felt "empty and lost" and his dignity and self-esteem were taken from him); *Muldrew v. Anheuser-Busch, Inc.*, 728 F.2d 989, 993 (8th Cir. 1984) (finding $125,000 award for mental anguish in § 1981 case to be reasonable).

In the present case, Eich testified:

> It's very frustrating to know that that behavior I was subjected to would be allowed to happen for so long, so many times and nothing be done to correct it. They didn't care anything about what I contributed to the university. They put in my job performance or my job performance reviews I am a valuable employee of the university but when I turned to them for help it was like I was nothing. There is just no way to really describe everything that I have been through, the volume, the intense situations, the rejection of my requests for help. There is just, there is really no words to describe how completely and totally devastating everything that has happened to me has been. It's completely destroyed everything.

Appellant's Br. at 55. Her testimony reflects how demeaning and humiliating the actions of Drake and Gillespie were by reason of the abusive conduct used against her.

We cannot hold that the jury verdict, as rendered, shocks the judicial conscience. The remittitur reflects the trial judge's erroneous view that there was no evidence of sexual harassment. We find this was an abuse of discretion. The district court, under the existing record, failed to analyze the record by giving the Plaintiff the benefit of all reasonable inferences and resolving all conflicts in the evidence in her favor. Under the circumstances, we hold that it was for the jury to determine the reasonable amount of damages incurred. Therefore, we reinstate the verdict of $200,000 and reverse the district court.

JUDGMENT REVERSED WITH DIRECTIONS TO REINSTATE THE JURY'S VERDICT IN FAVOR OF EICH, AND THE DAMAGES WITHIN THE VERDICT OF $242,272.08.[4]

SMITH, Circuit Judge, concurring in part and dissenting in part.

The majority labels this sexual harassment case as one involving "the question of human decency." Although I agree that decency should be the baseline for all human interaction, including workplace interaction, Title VII of the Civil Rights Act involves a different inquiry–the question of discrimination.[5] Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). It expressly prohibits refusing to hire or discharging an employee based on a prohibited factor. *Id.*

---

[4]The Plaintiff is requested to forward to this court her request for attorney fees based upon the hours utilized in presenting the appeal. Similarly, the Plaintiff should refile her application for attorney fees in the district court.

[5]I share with my colleagues the view that all people should be treated withrespect and decency, in and out of the workplace. My disagreement with the majority should in no way be viewed as condoning the lamentable behavior exhibited by some of Central Missouri State University's employees.

Likewise, Title VII also expressly provides that "[i]t shall be an unlawful employment practice for an employer . . . otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Id.*

After careful review of the relevant precedents of the Supreme Court and those of our circuit, I consider the district court's grant of judgment as a matter of law to be a much closer call than the majority allows. The evidence of discrimination presented in this case, while adequate, is not as cogent as the majority states.

## I.

Title VII makes no express mention of sexual harassment; the Supreme Court, however, has recognized that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986) (other internal quotation marks and citations omitted)). The Court went on to explain that "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Id.* at 67 (citing *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971)).

In cases like Ms. Eich's–commonly described as hostile-environment cases–an employer's harassing actions towards an employee do not constitute employment discrimination under Title VII unless there is proof that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer. *See Duncan v. General Motors Corporation*, 300 F.3d 928, 933 (2002); *Spicer v. Va., Dep't of Corr.*, 66 F.3d 705, 710 (4th Cir. 1995)

(en banc). Therefore, under our circuit's jurisprudence, a pervasively hostile or abusive atmosphere does not create a cause of action for sexual harassment under Title VII unless the plaintiff is able to show discriminatory treatment because of sex. *Meritor Sav. Bank*, 477 U.S. at 66. "[W]orkplace harassment, even harassment between men and women, is [not] automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998). "'The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Id.* (quoting *Harris*, 510 U.S. at 25 (1993) (Ginsburg, J., concurring)).

Thus, a finding of "discriminat[ion] . . . because of . . . sex" depends not simply on identifying the various harassing behaviors to which an individual is exposed. Rather, the showing must support an inference that the harassing conduct is both "discriminat[ion]" and is "because of ... sex"–in other words, *but for* the employee's gender, he or she would not have been the victim of the discrimination. *See Oncale*, 523 U.S. at 80–81.

After applying the foregoing principles, I am left with the opinion that several of the episodes of harassing behavior upon which the majority relies, considered–as I am required to do–in the light most favorable to Ms. Eich, do not amount to discrimination. First, I am troubled by the characterization of Gillespie's frequent visits to Ms. Eich's office–discussing work-related and personal topics–as discriminatory behavior. The evidence showed that Gillespie spent large amounts of time talking to all of the sergeants, both male and female. Also, the record shows that these "personal" discussions had a mutuality. Ms. Eich voluntarily discussed personal matters, including such intimate topics as her breast augmentation and a rape she suffered, with both of the accused harassers. Because I see no nexus between Gillespie's frequent visits and Ms. Eich's gender, I believe this evidence should have no material impact on the establishment of Ms. Eich's prima facie case of harassment.

Second, Gillespie's comments–made during a cold football game–regarding fishing in his pants to find "it" in order to go to the restroom and supplying a jar of Vaseline to an individual arrested for child molestation were not individually directed at Ms. Eich. Instead–as noted by the majority–the comments were made in group settings, where both male and female officers were present. Similarly, Drake's simulated sex act with a nightstick also took place in a group setting. There is simply no evidence that Ms. Eich was the "individual target" of this vulgar talk and behavior. And, as *Duncan* notes, "[a]n offensive workplace atmosphere does not amount to unlawful discrimination unless one gender is treated differently than the other. *Id*. at 933. Accordingly, I do not rely on these acts in arriving at my conclusion that Ms. Eich presented a case adequate to warrant consideration by the jury.

Third, the majority offers an incomplete description of Ms. Eich's allegation–which is presumed to be true–that Drake frequently touched her hair and shoulders. The majority noted that another female employee, Frances Behm, testified that Drake also touched her hair and shoulders. The majority did not, however, mention the uncontroverted evidence that Drake tended to touch both males and females when he talked to them. Behm testified that she observed Drake touch other personnel, and that when she was touched by Drake she did not consider the behavior to be "sexual." I do not view the majority of these touchings as discriminatory because they did not subject Ms. Eich to "disadvantageous terms or conditions of employment to which members of the other sex [were] not exposed." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring). Again, my conclusion that Ms. Eich presented the minimum of requisite evidence to have her claim heard by a jury is not dependent on these questionably relevant touchings.

Despite the foregoing concerns, when viewed in the light most favorable to the verdict, I believe the relevant evidence is susceptible to a reasonable interpretation supporting the verdict. Therefore, the jury's verdict finding that Ms. Eich suffered discrimination because of sex should stand.

## II.

As already stated, I join with the majority in reversing the district court's judgment as a matter of law; however, I must dissent from the majority's finding of abuse of discretion in the district court's alternative judgment.

"[T]he standard we will apply in determining whether there was an abuse of discretion in ordering the remittitur is whether the remittitur was ordered for an amount less than the jury could reasonably find." *Slatton v. Martin K. Eby Construction Co.*, 506 F.2d 505, 508–09 (8th Cir.1974); *See also Ouachita Nat. Bank v. Tosco Corp.*, 716 F.2d 485, 488 (8th Cir. 1983). Here, the district court–following its determination on the issue of discrimination–stated its intent to require remittitur or a new trial for CMSU should this court reverse its finding that Ms. Eich failed to state a prima facie case under Title VII. The district court reduced the jury award for non-economic damages from $200,000 to $10,000, finding that the evidence failed to support the higher sum.

I agree with the district court. Ms. Eich offered no expert testimony on non-economic damages, nor did she provide testimony of physical manifestations of psychological harm. Other than Ms. Eich's own testimony, there was no other evidence offered supporting these damages. Ms. Eich's principal complaints pertained to the difficulties attending her employment status following her resignation, not the conduct of Gillespie and Drake. While medical or other expert evidence is not required to prove emotional distress in Title VII cases, proof more substantial than that offered by Ms.Eich is required by our precedents. *Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.*, 130 F.3d 349 (8th Cir. 1997); *See also Forshee v. Waterloo Industries, Inc.*, 187 F.3d 527 (8th Cir. 1997).

### III.

For the foregoing reasons, I concur in the majority's decision to reverse the grant of judgment as a matter of law and dissent from its reversal of the district court's remittitur order.

_____