# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 03-2582

———————

Marlene Rowe,               *
                             *
        Appellee,        *
                             *    Appeal from the United States
   v.                        *    District Court for the
                             *    Eastern District of Missouri.
Hussmann Corporation,      *
                             *
        Appellant.       *

———————

Submitted: January 14, 2004
Filed: August 26, 2004

———————

Before WOLLMAN, RICHARD S. ARNOLD, and MORRIS SHEPPARD ARNOLD,
Circuit Judges.

———————

WOLLMAN, Circuit Judge.

A jury awarded Marlene Rowe $500,000 in emotional distress damages and $1,000,000 in punitive damages after finding that Rowe had endured a sexually hostile work environment that her employer, Hussmann Corporation (Hussmann), knew of and failed to rectify promptly. The district court[1] denied Hussmann's motions for judgment as a matter of law and new trial and also refused to remit the jury's damage awards. Hussmann appeals, arguing that Rowe's claims were time-

———————

[1]The Honorable Charles A. Shaw, United States District Judge for the Eastern District of Missouri.

barred and, alternatively, that the damage awards were unsupported and are excessive. We affirm.

## I.

Hussmann manufactures commercial refrigeration units for food stores at a large plant in Bridgeton, Missouri. The plant employs between 1200 and 1700 employees belonging to the steelworkers' union, Rowe among them. Rowe began working in Hussmann's Bridgeton facility in 1995 and was transferred into its shipping department in June 1996. As a laborer, Rowe's duties in shipping primarily involved packing Hussmann's refrigeration units onto delivery trucks. She was the only female out of 20 to 25 employees regularly employed in shipping.

Rowe encountered Roy Moore in the shipping department. A longtime Hussmann employee, Moore began asking Rowe out on dates and requesting her phone number. Although Rowe told Moore that she was not interested, he was undeterred. Rowe testified that between 1996 and early 2000, Moore engaged in a campaign of sexual harassment that included offensive comments, forced touching, and even threats of rape and murder.

Among other things, Moore told Rowe he "loved her" and informed shipping department co-workers that Rowe was "his woman." He offered Rowe $200 to take a day off and go to a motel with him. On another occasion, he asked Rowe to feel his penis to see how big it was, saying to her that "he could really make me holler and stuff." In February 1999, Moore learned that Rowe had a boyfriend, whereupon he became angry and asked Rowe if she "gave his stuff away," meaning sex. He then asked Rowe whether she performed oral sex (although he used a term other than that) on her boyfriend. In response to Rowe's denial that she did so, Moore called her a "fucking liar," saying that if she didn't perform that sexual act her boyfriend would not stay with her. Moore asked Rowe about cheating, and when Rowe replied that

she did not cheat on her boyfriend, Moore said, "Well, if you just put the head of your penis in you, it doesn't mean you're cheating." Moore repeatedly touched Rowe's breasts and buttocks against her will and, in the fall of 1999 and spring 2000, took to slapping Rowe on the arm when she moved to avoid him, once telling her to "shut the fuck up" when she protested the assault. Moore threatened to rape, kill, or otherwise "get even" with Rowe if she informed anyone of his behavior and, on one occasion, told Rowe (who is white) that he liked to "break a white woman's spirit."

Rowe testified that in October of 1996 she complained about Moore's conduct by telling Oscar Weston, her direct supervisor, that Moore had been bothering her by touching her on her breasts and buttocks. Weston responded by saying that Moore should know better because he had had two earlier incidents of similar behavior, and that he (Weston) would talk to Moore about the matter. Following Rowe's initial complaint, Moore left Rowe alone for a short time and then resumed his earlier behavior, which worsened even as it continued. Notwithstanding Rowe's renewed complaints to Weston ("at least two or three times a month"), Moore continued his harassing, abusive conduct. Weston responded to Rowe's complaints by promising to handle the situation, once suggesting that Rowe should understand that Moore had only an eighth grade education and did not know any better. Rowe testified that Moore's harassment continued until late March of 2000, when Rowe entered Weston's office very much upset and crying. Weston's supervisor was present, and Rowe proceeded to tell Weston that something had to be done because Moore's behavior was getting worse. Thereafter, on April 3, 2000, Weston and his supervisor warned Moore not to speak with or touch Rowe again.

Later that month, Rowe attended a department safety meeting, during which the employees were informed that another worker had followed a sheet metal supervisor home and attacked him. Rowe noticed Moore at the meeting, observing that Moore "had real cold eyes staring at me, just looking at me." Rowe awoke the

next morning to find that a large rock had been thrown through the windshield of her car.

Rowe told the police that Moore was a possible suspect in the vandalism and informed Weston the following day that she wanted to make an appointment to see Lou Stralka, Hussmann's human resources generalist. Rowe testified that Weston responded: "Do you really want to do this? You know what's going to happen." Rowe persisted and informed Stralka during the appointment that the police would be coming to the plant to speak with Moore. During the course of her conversation with Stralka, Rowe explained that Moore had been harassing her and described Moore's behavior.[2]

Stralka instituted an investigation and offered to transfer Rowe to a different department. Rowe agreed, and when Weston informed Rowe of the transfer, he stated: "We're moving you . . . . You have to watch people around you because [Moore] has a lot of friends in here . . . . And I told [Moore] to stay away from you, and you are to stay away from [him]." After working in the new position for 30 days, Rowe successfully bid on yet another job and moved into a department located a significant distance from shipping.

In June 2000, Rowe took to eating her lunch and taking her coffee breaks in the women's restroom to avoid encountering Moore in the plant. Following her transfer from shipping, she encountered Moore on several more occasions in the plant, usually as Moore drove past Rowe's work area on his forklift. On at least two occasions, Moore was not carrying a load of items on his forklift, and in one encounter in

---

[2]The interview notes contemporaneously made by Stralka indicate that Rowe said, "I complained to O[scar] W[eston] about Roy Moore sexually harassing me several incidences [sic] over four years."

October 2002, two weeks prior to trial, Moore stared fixedly at Rowe while driving past.

## II.

We review de novo a motion for judgment as a matter of law, applying the same standard as that used by the district court. Varner v. Nat'l Super Markets, Inc., 94 F.3d 1209, 1212 (8th Cir. 1996). Accordingly, we view the facts in the light most favorable to Rowe and reverse only if no reasonable juror could have found in her favor. Sanders v. May Dept. Stores Co., 315 F.3d 940, 943, cert. denied, 539 U.S. 942 (2003). Because Rowe brought her claim under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Title VII), and the Missouri Human Rights Act, Mo. Rev. Stat. § 213.010 et. seq. (MHRA), we consider timeliness under each statute separately.

### A. Timeliness Under Title VII

Title VII provided Rowe "three hundred days after the alleged unlawful employment practice occurred" in which to file a charge with the Equal Employment Opportunity Commission (EEOC). 42 U.S.C. § 2000e-5(e)(1). Rowe filed with the EEOC on June 7, 2000, which fixes the 300-day mark at August 12, 1999.[3] Because her charge alleged a hostile work environment – a claim based on the "cumulative effect of individual acts" – Rowe's hostile work environment claim was timely if "an act contributing to [the] claim occur[ed] within the filing period . . . ." Nat'l RR

---

[3]Citing Edelman v. Lynchburg College, 535 U.S. 106, 114 (2002), Rowe suggests that her earlier submission of verified answers to the EEOC intake questionnaire constituted "filing" for purposes of the applicable Title VII limitations period. We do not reach this issue because the parties agree that exact commencement date of the limitations period is immaterial on these facts. For convenience, we will use August 12, 1999.

Passenger Corp. v. Morgan, 536 U.S. 101, 115, 117 (2002). This determination requires that we consider "whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." Id. at 120.

Addressing the latter question first, it is clear that Rowe complained about various acts of sexual roguery that occurred after August 12, 1999 – within the statutory time period – so Hussmann focuses on the former inquiry: whether the acts before and after August 12, 1999, were part of the "same actionable hostile work environment practice." Hussmann seizes on language in Morgan stating that an employee may not recover for previous acts of harassment if a later act "has no relation" to the previous acts "or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim . . . ." Id. at 118. Relying on our opinion in Gipson v. KAS Snacktime Co., 171 F.3d 574, 580 (8th Cir. 1999), Hussmann argues that Rowe's trial testimony either established a "two year hiatus" in harassment immediately prior to September 1999, or was contradictory on the point. Thus, Hussmann contends, the acts during the 300-day limitations period and those outside it cannot be considered part of the same actionable hostile work environment practice. We disagree, as Hussmann's contention ignores our obligation to resolve all factual conflicts in Rowe's favor. See Lawrence v. CNF Transp., Inc., 340 F.3d 486, 491 (8th Cir. 2003).

Unlike Gipson, this case does not involve undisputed evidence of a 21-month cessation of contact between the harrasser and victim that continued well into the limitations period. On cross examination, Rowe did testify that Moore left her alone for a "long period," and she acknowledged that she had stated during her deposition that she thought she was free of Moore "in 1998 or earlier" before he resumed approaching her in September 1999. In the same testimony, however, Rowe stated

-6-

that any time gap "could not have been two years,"[4] and she elsewhere testified that Moore "never" left her alone, including the above-described February 1999 incident in which Moore, in the crudest of terms, asked Rowe about her sexual relationship with her boyfriend and then in obscene terms accused Rowe of lying about not having engaged in a certain sex act. The version of the facts favorable to Rowe thus

[4] Q. And then it was that you began to warn other women that came into the workplace to stay away from this guy?

A. Yes.

Q. And he got angry with you, and he said you shouldn't be telling those women that, right?

A. Yes.

Q. And that after that conversation he left you alone for a long period of time?

A. Yes.

Q. And from that point until things started up again, you thought you were free of him; is that right?

A. Right.

Q. Okay. And that was, you told me in the deposition, in 1998 or earlier?

A. Right.

Q. Do you recall giving me that testimony?

A. Yes.

Q. Okay. And then the next thing that happened after the time frame when he left you alone and you thought you were free of him was September 1999, that incident, right?

A. Right . . .

Q. So . . . we've gone like a year or two or whatever it is where he left you alone and you were free of him, and there was this incident [in September 1999], and then there's another two month gap or so from September to November of 1999.

A. It couldn't have been two years.

Q. Okay. Well, whatever it is, and your testimony is what it is on that. But in any event, after this one incident [in September 1999], he left you alone for another two months, right?

A. Right.

Trial Tr., Vol. I, at 114-16.

establishes, at most, a seven-month hiatus in harassing acts between February and September 1999.

In Morgan, the Supreme Court noted that where acts contributing to a hostile work environment occur on days 1-100 and day 401, "it does not matter whether nothing occurred within the intervening 301 days so long as each act is part of the whole." Id., 536 U.S. at 118. The Court went on to affirm the Ninth Circuit's judgment that the plaintiff was entitled to a trial on his hostile work environment claim because the Court could not "say that [the pre–and post-limitations incidents] [we]re not part of the same actionable hostile work environment claim." Morgan, 536 U.S. at 121; cf. Jensen v. Henderson, 315 F.3d 854, 859 (8th Cir. 2002). The same conclusion obtains here.

In the present case, it was the same harasser, Moore, committing the same harassing acts both before and after August 12, 1999; there was evidence that Hussmann was made aware of this harassment through Weston; and there is no evidence of any "intervening action," Morgan, 536 U.S. at 118, by Hussmann that can fairly be said to have caused the later acts of sexual harassment to be unrelated to those which occurred during the period when Rowe was first forced to run the gauntlet of Moore's repeated verbal and physical harassment and abuse. Accordingly, we conclude as a matter of law that the acts before and after the limitations period were so similar in nature, frequency, and severity that they must be considered to be part and parcel of the hostile work environment that constituted the unlawful employment practice that gave rise to this action. See Morgan, 536 U.S. at 107 (noting Ninth Circuit's requirement that acts "cannot be isolated, sporadic, or discrete." (citation and internal quotation marks omitted)); Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 573 (8th Cir. 1997) ("evidence concerning all circumstances of the complainant's employment must be considered, including the frequency of the offending conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with work performance.").

We turn, then, to Hussmann's late-tendered claim of instructional error. Although it presented no argument to that effect in its opening or reply brief, other than a reference to the fact that its proposed instruction had been refused, at oral argument Hussmann contended that the rejection of the proposed instruction constituted reversible error. Passing the question whether Hussmann failed to preserve this issue for our review, we conclude that the district court did not err in refusing to give the instruction.

The proposed instruction directed a finding for Hussmann if the jury found one of three conditions: "(1) that no acts by Roy Moore, as described in the First paragraph of [the elements instruction], took place between August 12, 1999 and June 7, 2000, or (2) that defendant lacked knowledge of any such acts, as described in the Sixth paragraph of [the elements instruction], between August 12, 1999 and June 7, 2000; or (3) that defendant did not fail to take appropriate action, as described in the Seventh paragraph of [the elements instruction], between August 12, 1999 and June 7, 2000."

To repeat the holding of Morgan, if at least one act contributing to the hostile environment occurred within the charge period, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." 536 U.S. at 117. The second alternative in Hussmann's proposed instruction thus states an incorrect proposition of law, for it allows the employer to avoid liability if it lacked knowledge of particular harassing acts that occurred during the charge period, irrespective of its knowledge of prior harassment. The third alternative erroneously absolves the employer of liability by directing the jury to find in its favor if it undertook appropriate action within the charge period, regardless of its knowledge and behavior prior to that time. Accordingly, because the proposed instruction did not correctly state the applicable law, see Cox v. Dubuque Bank & Trust Co., 163 F.3d 492, 496 (8th Cir. 1998), the district court did not err in refusing to submit it to the jury.

**B. Timeliness Under MHRA**

Hussmann also contends that Rowe's hostile work environment claim is time-barred under MHRA.[5] Although the Missouri courts routinely follow federal law when interpreting MHRA, Hussmann argues that Missouri law is more restrictive than post-Morgan federal law. Hussmann suggests that while Morgan requires only one act contributing to a violation within the limitations period, Missouri law requires an actual violation within the state limitations period of 180 days, which Hussmann alleges Rowe failed to show. This is mere wordplay, as the predicate to recovery under both Title VII and Missouri law has always been proof of a violation within the relevant limitations period. The critical question is what evidence may be considered to prove that violation.

Morgan holds that liability and damages may be determined based on acts beyond the limitations period, provided those acts contribute to the same actionable hostile work environment. Albeit composed of individual acts, a hostile work environment is but a single unlawful employment practice under Title VII, and it matters not if one or all of the component acts occurred within the limitations period. In each, an unlawful employment practice (and therefore a violation) has occurred within the limitations period. See Jensen, 315 F.3d at 859 (noting that "[only the smallest portion of that 'practice' needs to occur within the limitations period for the claim to be timely.").

Missouri law is not to the contrary, for the Missouri courts have concluded that application of MHRA's 180-day statute of limitations is subject to equitable exceptions, including the continuing violation doctrine. Pollock v. Wetterau Food Distrib. Grp., 11 S.W.3d 754, 763 (Mo. Ct. App. 1999). Missouri applies a two-part

---

[5]The limitations period under MHRA is 180 days, so the relevant limitations date here was December 10, 1999.

test to determine if a plaintiff has shown a continuing violation. The plaintiff must first "demonstrate that at least one act occurred within the filing period" and, second, must show "that the harassment is a series of interrelated events, rather than isolated or sporadic acts of discrimination." Id. If the plaintiff proves both, "the 180-day filing period becomes irrelevant . . . [and] [s]he may then offer evidence of the entire continuing violation. Id. This principle, although understood as an equitable exception to the limitations period in Missouri, is consistent with Morgan's view of Title VII's statutory language. In each, the component acts must be sufficiently related to form a single practice, at least part of which "continued into the limitations period." Pollock, 11 S.W.3d at 763 (quoting Gipson, 171 F.3d at 579); see also Walsh v. National Computer Systems, Inc., 332 F.3d 1150, 1157 (8th Cir. 2003) (finding Morgan's "continuing violation theory" applicable to MHRA pregnancy discrimination claim). We therefore reject Hussmann's contention that Rowe's MHRA claim was time-barred for the same reasons we reject its argument under Title VII.[6]

## C. Damages

Hussmann's final challenges involve the jury's damage awards. It first contends that the $500,000 awarded for Rowe's emotional distress was excessive and should be remitted. Second, it argues that the jury should not have been allowed to

---

[6]We likewise reject Hussmann's contention that Rowe's damages under MHRA are limited to the 180-day period after December 10, 1999, by virtue of our decisions in Ashley v. Boyle's Famous Corned Beef Co., 66 F.3d 164 167-68 (8th Cir. 1995) (en banc) and Gipson, 83 F.3d at 230. Missouri courts imposed this limitation by relying on federal precedent that Morgan clearly overrules. See Madison v. IBP, Inc., 330 F.3d 1051, 1057 (8th Cir. 2003) ("Since the rule in Ashley had limited recovery for hostile work environment plaintiffs to discriminatory or harassing acts occurring within the charge filing period, the rule is contrary to Morgan and may no longer be applied.").

consider and award punitive damages and, alternatively, that $1 million in punitive damages was excessive and should be remitted.

Compensatory damages for emotional distress must be supported by "competent evidence of a genuine injury," and a plaintiff's own testimony can carry this burden. Kucia v. Southeast Arkansas Community Action Corp., 284 F.3d 944, 947 (8th Cir. 2002) (internal quotation marks and citation omitted). Moreover, we review the size of the compensatory award "with a keen sense of respect for the latitude given to juries," and will order remittitur only if the verdict is so grossly excessive as to shock the conscience. Id.; Ouachita Nat'l Bank v. Tosco Corp., 716 F.2d 485, 488 (8th Cir. 1983). Rowe testified to a constant fear of Moore and to experiencing panic attacks variously characterized by nausea, headaches, sweating, and hyperventilation. She was so afraid of Moore that she moved to a different home, obtained a gun card, purchased mace, and since June of 2000 has been eating lunch and taking coffee breaks in the women's restroom to avoid any contact with Moore. Rowe indicated that her fear has adversely affected her relationship with her four children. Her treating psychologist testified that Rowe suffers from an anxiety disorder and that her prognosis is poor.

We conclude that although the compensatory damages award is substantial, we do not view it as monstrous or shocking, given the testimony regarding Moore's repeated abusive conduct. See Jenkins v. McLean Hotels, Inc., 859 F.2d 598, 600 (8th Cir. 1988). As we recently noted in Eich v. Board of Regents for Cent. Missouri State University, 350 F.3d 752, 763 (8th Cir. 2003), "awards for pain and suffering are highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms." (internal quotation marks and citations omitted). In Eich, which involved abuse no more severe than that to which Rowe was subjected, we reinstated an award for $200,000. Because it is difficult to quantify the extent of the psychic injury that months and years of unwanted touching and verbal abuse, combined with

-12-

threats of murder and rape, might cause, it was for the jury, equipped as it was with the collective wisdom that life's experiences confer, to determine the amount that would adequately compensate Rowe for that injury, and thus we decline to reduce the compensatory award. Cf. Madison v. IBP, Inc., 330 F.3d 1051, 1054 (8th Cir. 2003) (affirming award of $266,750 in emotional distress damages and $76,667 in back pay and benefits); Warren v. Prejean, 301 F.3d 893, 899 (8th Cir. 2002) (upholding remitted award of $60,000 in actual damages and $150,000 in compensatory damages).

We likewise conclude that the jury was properly allowed to consider and award punitive damages. Title VII allows punitive awards in the "narrow class of cases" where the employer acts with malice or reckless indifference to the federally protected rights of the employee. See Lawrence, 340 F.3d at 495; 42 U.S.C. § 1981a(b)(1). This standard does not require egregious misconduct, Ross v. Kansas City Power & Light Co., 293 F.3d 1041, 1048 (8th Cir. 2002) (en banc), but there must be evidence that the employer intentionally discriminated and had "knowledge that it may be acting in violation of federal law." Kolstad v. American Dental Ass'n, 527 U.S. 526, 535, 119 (1999). Under Missouri law, punitive damages are likewise available when the defendant's conduct is "outrageous" due to evil motive or reckless indifference to the rights of others, and must be proven by clear and convincing evidence. Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 575 (8th Cir. 1997); Burnett v. Griffith, 769 S.W.2d 780, 789 (Mo. 1989) (en banc) (noting that punitive damages require proof of a "wilful, wanton, or malicious culpable mental state.").

Moore subjected Rowe to forced touching bordering on criminal sexual abuse, threats of murder, rape, and other physical violence, and all manner of sexual comment and innuendo, including belittling announcements to employees in the department that Rowe was "his woman." The jury was entitled to find that Weston, whom Hussmann had placed in charge of the shipping department, knew of this abusive and degrading environment, yet not only allowed it to persist but often

defended Moore by suggesting that Moore was uneducated and did not know any better. Recklessness and outrageousness may be inferred from evidence of "management's participation in the discriminatory conduct," Kimzey, 107 F.3d at 575, or where an employee's repeated complaints to supervisors fall on deaf ears. Henderson v. Simmons Foods, Inc., 217 F.3d 612, 619 (8th Cir. 2000). In light of Weston's knowledge of Moore's abusive conduct, his repeated failure to take effective action to put a stop to such conduct, and his defense of and excuses for that conduct, all chargeable to Hussmann, the evidence is sufficient to support the award of punitive damages.

Like the compensatory damages award, the punitive damages award is substantial. We review the district court's decision not to order remittitur only for abuse of discretion, because Hussmann has not mounted a constitutional challenge to the size of the award. See Cooper Indus. Inc. v. Leatherman Tool Group Inc., 532 U.S. 424, 433 (2001) (constitutional challenges are reviewed de novo, otherwise for abuse of discretion). It bears noting that punitive damages under Title VII are capped at $300,000, an amount that we have upheld in other sexual harassment cases. See, e.g., MacGregor v. Mallinckrodt, Inc., 373 F.3d 923, 927 (8th Cir. 2004); Walsh, 332 F.3d at 1162. The remainder of the award is affirmable under state law, which has no cap.

In Missouri, the amount of punitive damages is a matter left to the discretion of the jury, and a court may find that the jury abused its discretion only where "the amount of punitive damages bears no reasonable relation to the injury inflicted on the plaintiff or the award is the result of improper motive on the part of the jury amounting to misconduct." Wisner v. S.S. Kresge Co., 465 S.W.2d 666, 670 (Mo. Ct. App. 1971). We cannot say that that occurred in this case. Cf. Weaver v. African Methodist Episcopal Church, Inc., 54 S.W.3d 575, 589 (Mo. Ct. App. 2001) (upholding award of $4 million where defendant's grabbing of the victim's breasts

"was merely the culmination of a long history of far worse verbal and physical sexual harassment . . . .").

In sum, we conclude that the district court did not abuse its discretion in denying the motion for remittitur.

The judgment is affirmed.

_____