08-4661-cv
McGullam v. Cedar Graphics, Inc.

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2009

(Argued: April 13, 2010          Decided: June 15, 2010)

Docket No. 08-4661

- - - - - - - - - - - - - - - - - - - -x

DONNA L. McGULLAM,

                 Plaintiff-Appellant,

          - v.-

CEDAR GRAPHICS, INC.,

                 Defendant-Appellee.

- - - - - - - - - - - - - - - - - - - -x

          Before:        JACOBS, Chief Judge, KEARSE and
                         CALABRESI, Circuit Judges.  Judge
                         Calabresi concurs in a separate opinion.

     Appeal from a judgment of the United States District

Court for the Eastern District of New York (Hurley, J.),

granting summary judgment on federal and state law claims of

a sexually hostile work environment, disparate treatment,

and retaliation.  Regarding the Title VII hostile work

environment claim to which this appeal is limited, we affirm

the grant of summary judgment on the ground that the one

non-trivial comment that may fall within the limitations

period is insufficiently related to the earlier course of alleged harassment, under National Railroad Passenger Corporation v. Morgan, 536 U.S. 101 (2002).  Judge Calabresi concurs in the judgment and opinion of the Court and files a separate opinion.

                                    DONNA L. McGULLAM, pro se,
                                    Eastport, NY.

                                    ANA C. SHIELDS (Mark S. Mancher,
                                    on the brief), Jackson Lewis
                                    LLP, Melville, NY, for Appellee.

DENNIS JACOBS, Chief Judge:

Plaintiff-appellant Donna L. McGullam appeals pro se from a judgment of the United States District Court for the Eastern District of New York (Hurley, J.), granting summary judgment on federal and state law claims of a sexually hostile work environment, disparate treatment, and retaliation in favor of McGullam's employer, defendant-appellee Cedar Graphics, Inc.  Regarding the Title VII hostile work environment claim to which this appeal is limited, we affirm on the ground that the one non-trivial comment that may fall within the limitations period (which was made nearly one year after Cedar Graphics had transferred McGullam to another department) is insufficiently related to the earlier course of alleged

2

harassment.  The governing authority is <u>National Railroad Passenger Corporation v. Morgan</u>, 536 U.S. 101 (2002).

**BACKGROUND**

For reasons explained later in this opinion, McGullam was required to file a complaint with the appropriate agency within 300 days of the last instance in a course of harassment; and if she did, that filing would have allowed her to plead the full prior course of related harassment.

The relevant chronology is that in April 1996, McGullam was hired by Cedar Graphics, a full-service printing company, to work in the production department.  On September 22, 1999, after she complained of sexual harassment and at her request, she was transferred to a position in the estimating department.  She was terminated on September 12, 2000, and she filed her complaint with the relevant agencies on July 3, 2001.

McGullam alleges that when she was in the production department she "was regularly exposed to sexual comments, sexually explicit matters, sexual jokes, hostile [and] vulgar language, sexual [innuendos] and gross behaviors, primarily by male coworkers, including management" despite

3

"[c]ontinual complaints to management."  According to McGullam's unsworn "journal" (submitted by McGullam in the district court and accepted as true by Cedar Graphics for purposes of the summary judgment motion), this offensive "production department conduct" included, but is not limited to, the following:

- On the first day of McGullam's employment, April 15, 1996, she was asked to retrieve a file by climbing a ladder and the male co-worker holding the ladder told her "not to worry, that he wasn't going to look up [her] skirt."

- In winter 1997, McGullam brought several packages to the shipping department late one evening and a male co-worker commented in part that "'I didn't think you could even drag your big fat ass back here.'"

- In November 1998, a male co-worker in whom McGullam had confided about a "romantic break up," "attacked [her] in front of the entire production department" by stating: "'I think you'd be a lot happier person if you got f****d more often.  Yeah, I think that's definitely your problem, you don't get f****d enough.'"

- In July 1999, a male co-worker "sitting at his desk with both arms outstretched toward [McGullam] and one hand shaped into a gun" stated "'I'd like to pump a bullet into your head, right behind your ear and blow your brains out.'"

- In summer 1999, McGullam "had to endure overhearing the details of a conversation" in which a female co-worker told two male co-workers that she witnessed an act of "'doggie style'" sex in the bathroom of a nightclub the previous weekend.

- On an unknown date, a male co-worker commented "'Boing, boing, look at that--right through the denim,'" a

4

"reference to the fact that [McGullam's] hardened nipples were visible even through [her] denim jumper."

• On an unknown date, an unknown person replaced a sign McGullam had taped to her computer that read "'A lot goes into being the best,'" with a similar sign that read "'A lot goes in to being the bitch.'"

McGullam's journal explains that she "was desperate to remove" herself from the production department and therefore requested transfer to an open position in the estimating department, "which was on the other side of the building-- hopefully far enough away from the hostility, harassment and threats of violence." As McGullam explained at her deposition, she "mov[ed] because [she] could not take working in this sexually aggressive and hostile environment where [she] was eventually physically threatened by a colleague."[1]

McGullam complains of only a single incident post-dating her September 22, 1999 transfer:

> While working in the estimating department, I was away from the majority of the harassment, hostility and aggravation. However, all comments of a sexual and derogatory nature did not cease entirely. On the opposite side of my cubic[le] wall was a salesman . . . [who] carried on numerous lengthy conversations with male buddies

---

[1] Despite this stated rationale and the attendant pay cut, McGullam publicly portrayed her transfer as a positive career move.

> and made frequent comments about women such as referring to them as "chickies[."]  He also remarked that "[i]f it wasn't going to be a sleep-over, she wasn't worth the trip[,"] regarding a woman friend that he was involved with (translating to: she's only worth the trip if I'll be getting sex).  This was a thoroughly demeaning comment regarding women.

The salesman who offended McGullam by the "chickies comments" and the "sleep-over comment" was not a member of the production department or of the estimating department.

On September 12, 2000, Cedar Graphics terminated McGullam's employment.  On July 3, 2001, McGullam filed a complaint with the New York State Division of Human Rights (the "NYSDHR") and the United States Equal Employment Opportunity Commission (the "EEOC") alleging a sexually hostile work environment and retaliatory termination.  On February 9, 2004, the NYSDHR issued a Determination and Order After Investigation finding no probable cause and dismissing McGullam's complaint.  On April 2, 2004, the EEOC adopted the findings of the NYSDHR, dismissed McGullam's complaint, and issued a right-to-sue letter, which McGullam received on April 8, 2004.

On July 6, 2004, McGullam pro se filed this lawsuit, alleging that she was discriminated against on the basis of sex in violation of Title VII of the Civil Rights Act of

6

1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII") (the relevant text is in the margin[2]).  This appeal considers McGullam's claim of a "[s]exually [h]ostile [e]nvironment that was pervasive."  The disposition of her other claims is set forth in the margin.[3]

On December 21, 2007, Cedar Graphics moved for summary judgment, duly attaching a "Notice to Pro Se Litigant

---

[2] Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

[3] On this appeal, we consider only McGullam's Title VII sexually hostile work environment claim.  In her complaint, McGullam additionally alleged that Cedar Graphics discriminated against her by terminating her employment and by providing her with "[u]nequal terms and conditions of [] employment."  But by order dated March 18, 2009, this Court dismissed her appeal as to all non-hostile work environment claims "because they lack an arguable basis in law or fact."  By order dated May 21, 2009, this Court denied McGullam's motion for reconsideration of the March 18, 2009 order.  To the extent that the district court construed McGullam's complaint as additionally asserting claims pursuant to the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq., the district court lacked subject matter jurisdiction over those claims.  New York's election of remedies statute deprives New York courts of jurisdiction to hear claims filed with the NYSDHR and dismissed for any reason other than those listed in the statute.  See N.Y. Exec. Law § 297(9).  "[A] state law depriving its courts of jurisdiction over a state law claim also operates to divest a federal court of jurisdiction to decide the claim."  Moodie v. Fed. Reserve Bank of N.Y., 58 F.3d 879, 884 (2d Cir. 1995).

Opposing Motion for Summary Judgment." McGullam failed to file any opposition. On August 20, 2008, the district court granted summary judgment on the Title VII hostile work environment claim and entered final judgment in favor of Cedar Graphics. The district court determined that (i) the hostile work environment claim was time-barred, and (ii) in the alternative, McGullam failed to raise a genuine issue of material fact as to the severity or pervasiveness of the complained-of conduct. McGullam v. Cedar Graphics, Inc., No. 04-CV-2891 (DRH)(AKT), 2008 WL 3887604, at *5-*7 (E.D.N.Y. Aug. 20, 2008). On September 19, 2008, McGullam timely filed a notice of appeal.

**DISCUSSION**

"We review an award of summary judgment de novo, and will uphold the judgment if the evidence, viewed in the light most favorable to the party against whom it is entered, demonstrates that there are no genuine issues of material fact and that the judgment is warranted as a matter of law." Global Network Commc'ns, Inc. v. City of New York, 562 F.3d 145, 150 (2d Cir. 2009); see also Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004)

8

(applying the same standard of review to the grant of an unopposed motion for summary judgment); Fed. R. Civ. P. 56(c)(2). Following de novo review, we affirm the grant of summary judgment, but do so on a ground different from either of the two alternative grounds relied on by the district court. See, e.g., Boy Scouts of America v. Wyman, 335 F.3d 80, 90 (2d Cir. 2003) ("[W]e may affirm the judgment of the district court on any ground appearing in the record.").

**I**

Relevant to this appeal, Title VII's administrative exhaustion provision requires that any complaint be filed with the EEOC within 300 days of the alleged discriminatory act. See 42 U.S.C. § 2000e-5(e)(1) (providing that where a complainant "has initially instituted proceedings with a State or local agency with authority to grant or seek relief," the complainant has 300 days from the occurrence of the "alleged unlawful employment practice" to file a complaint with the EEOC).

"When, as in this case, a plaintiff's allegations of discrimination extend beyond the 300-day limitations period, the nature of the claim determines what consideration will

9

be given to the earlier conduct." Petrosino v. Bell Atl., 385 F.3d 210, 220 (2d Cir. 2004). With respect to claims based on "termination, failure to promote, denial of transfer, or refusal to hire," Morgan, 536 U.S. at 114, section "2000e-5(e)(1) 'precludes recovery for *discrete* acts of discrimination or retaliation that occur outside the statutory time period,' even if other acts of discrimination occurred within the statutory time period," Patterson v. County of Oneida, N.Y., 375 F.3d 206, 220 (2d Cir. 2004) (quoting Morgan, 536 U.S. at 105).

But "[h]ostile work environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." Morgan, 536 U.S. at 115 (internal citation omitted). Accordingly, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile

10

environment takes place within the statutory time period."

Id. at 105; see also id. at 118 ("Given . . . that the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim.  In order for the charge to be timely, the employee need only file a charge within . . . 300 days of any act that is part of the hostile work environment.").  Morgan illustrated this holding with two 401-day scenarios:

> (1) Acts on days 1-400 create a hostile work environment.  The employee files the charge on day 401.  Can the employee recover for that part of the hostile work environment that occurred in the first 100 days?  (2) Acts contribute to a hostile environment on days 1-100 and on day 401, but there are no acts between days 101-400.  Can the act occurring on day 401 pull the other acts in for the purposes of liability?  In truth, all other things being equal, there is little difference between the two scenarios as a hostile environment constitutes one "unlawful employment practice" and it does not matter whether nothing occurred within the intervening 301 days so long as each act is part of the whole.  Nor, if sufficient activity occurred by day 100 to make out a claim, does it matter that the employee knows on that day that an actionable claim happened; on day 401 all incidents are still part of the same claim.  On the other hand, if an act on day 401 had no relation to the acts between days 1-100, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts, at least not by reference to the day 401

11

act.

Id. at 118. Accordingly, if "any act falls within the statutory time period," we need "to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice." Id. at 120.

**II**

We start by asking whether McGullam alleged any discriminatory act within the limitations period.

McGullam filed her complaint with the NYSDHR--which sent the complaint to the EEOC for dual filing purposes--on July 3, 2001. The limitations period therefore started on September 6, 2000 (300 days prior to July 3, 2001). Cedar Graphics terminated McGullam's employment on September 12, 2000. Accordingly, unless a discriminatory act contributing to her hostile work environment claim fell within the seven-day window--between the start of the limitations period on September 6, 2000 and the termination of her employment on September 12, 2000--her claim is time-barred.

The only conduct complained of after McGullam's September 22, 1999 transfer to the estimating department-- and therefore the only alleged discriminatory acts that could fall within the seven-day window--are the chickies

12

comments and the sleep-over comment. As alleged, the chickies comments are too trivial to contribute to a Title VII hostile work environment claim. They were not obscene or lewd, or even sexually suggestive. Even if the chickies comments could be deemed unrefined or uncivil, Title VII simply "does not set forth a general civility code for the American workplace." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). We therefore focus exclusively on the timing of the sleep-over comment.

McGullam nowhere dates that single incident. Then again, the statute of limitations is an affirmative defense, and the defendant has not tried to find out whether McGullam can date the incident. McGullam's submissions arguably allege that the sleep-over comment was made within the seven-day window.[4] See Terry v. Ashcroft, 336 F.3d 128, 137

_____

[4] This construction finds support in (i) McGullam's NYSDHR complaint, which asserted that the "most recent or continuing discrimination took place [on] 09/12/00"; (ii) McGullam's opposition to Cedar Graphics's motion for partial summary judgment, which asserted that her claim "encompassed the entire employment period"; and (iii) McGullam's November 21, 2008 motion to proceed in forma pauperis in this Court, which asserted that her claim was "of a continuous and ongoing nature from the first day of employment until the last and the entire time period is to be considered on that basis."

13

(2d Cir. 2003) ("In determining whether there are genuine issues of material fact, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." (internal quotation marks omitted)).  In any event, the district court assumed that the sleep-over comment occurred within the limitations period, and Cedar Graphics does not argue to the contrary on appeal.

**III**

Was the sleep-over comment sufficiently related to the production department conduct to be part of the same alleged hostile work environment practice?

Under <u>Morgan</u>, a sexually offensive incident within the limitations period permits consideration of an incident preceding the limitations period only if the incidents are sufficiently related.  "[I]t does not matter whether nothing occurred within the intervening [] days so long as each act is part of the whole."  <u>Morgan</u>, 536 U.S. at 118.

The district court's relatedness test was to consider whether the within-limitations period incident satisfied the severe or pervasive standard of a hostile work environment claim.  <u>See</u> <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21

14

(1993) (determining that to establish a Title VII hostile work environment claim, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" (internal quotation marks and citation omitted)).  Cedar Graphics urges us to use the same test.  However, this approach finds no support in Morgan, which emphasized that the "repeated conduct" giving rise to a hostile work environment claim "occurs over a series of days or perhaps years" and that a component act need not be "actionable on its own."  Morgan, 536 U.S. at 115.  We instead affirm using a different analysis.

Morgan requires courts to make an individualized assessment of whether incidents and episodes are related. Morgan's discussion of the 401-day scenarios does not limit the relevant criteria, or set out factors or prongs.  See Morgan, 536 U.S. at 118 ("[I]f an act on day 401 had no relation to the acts between days 1-100, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim,

15

then the employee cannot recover for the previous acts, at least not by reference to the day 401 act.").

This flexibility is useful in a context as fact-specific and sensitive as employment discrimination and as amorphous as hostile work environment. Morgan determined that "[a]lthough many of the acts upon which [the plaintiff's] claim depends occurred outside the 300 day filing period, we cannot say they are not part of the same actionable hostile environment claim" based on "evidence from a number of . . . employees that managers made racial jokes, performed racially derogatory acts, made negative comments regarding the capacity of blacks to be supervisors, and used various racial epithets." Id. at 120-21; see also Rowe v. Hussmann Corp., 381 F.3d 775, 781 (8th Cir. 2004) (where "it was the same harasser . . . committing the same harassing acts . . . ," concluding "as a matter of law that the acts before and after the limitations period were so similar in nature, frequency, and severity that they must be considered to be part and parcel of the hostile work environment"); Lucas v. Chi. Transit Auth., 367 F.3d 714, 727 (7th Cir. 2004) (finding that an "altercation in 2001" arising out of a "chance meeting" between an employee and a

16

former supervisor "simply cannot be considered part of" any "1997 hostile work environment" where there were "no incidents during the intervening years").

In this case, the sleep-over comment is insufficiently related to the production department conduct chiefly for two reasons. First, Cedar Graphics transferred McGullam (at her request) from the production department, where she experienced harassment, to the estimating department, which was a different environment in material respects--and in a different sector of the building. See Morgan, 536 U.S. at 118 (recognizing the importance of an "intervening action by the employer"). McGullam testified at her deposition that she had no problem with anyone in the estimating department.

Second, the sleep-over comment "had no relation to the" production department harassment. Id. In the production department McGullam encountered lewd and teasing comments that were about McGullam, and that were addressed to her or were made in her presence. The sleep-over comment-- offensive though it may have been--was not lewd, it was not about McGullam, and it was not addressed to her or made for her to hear it. And the salesman she overheard was a member of neither the production department nor the estimating

17

department.  Moreover, for the sleep-over comment to fall within the limitations period, it must have occurred nearly one year after McGullam's transfer.  Although that incident-free interval does not preclude relatedness, it renders less plausible the notion that the sleep-over comment is of a piece with the production department conduct.  Given these discontinuities, we have no trouble finding insufficient relatedness.

Accordingly, the sleep-over comment did not contribute to any hostile work environment claim based on the production department conduct and such a claim is therefore time-barred.[5]

---

[5] Unlike the district court, we therefore do not reach the merits of a hostile work environment claim based on the production department conduct and do not dwell on the severity (or lack thereof) of that pre-limitations conduct. Judge Calabresi does, however, for the purpose of recommending that the Morgan test be modified or re-imagined.  Under Judge Calabresi's reasoning, within-limitations conduct that is otherwise insufficiently related to pre-limitations conduct nevertheless may revive pre-limitations conduct if that conduct is especially severe. Thus, Judge Calabresi's concurring opinion states: "The severity of th[e] pre-limitations period conduct pushes in the direction of finding a single hostile work environment . . . ."

This reasoning turns Morgan on its head.  Morgan directs courts to evaluate the relatedness of within-limitations conduct and pre-limitations conduct.  Consistent with a flexible approach, courts may evaluate relatedness by comparing the severity of latter-day and earlier incidents. Obviously, the more similar the incidents are in severity,

18

McGullam's claim nevertheless might survive summary judgment if there were a triable issue as to whether the sole non-trivial incident occurring within the limitations period was itself of sufficient severity to support a hostile work environment claim (albeit a truncated claim premised on that single incident).  See, e.g., Howley v. Town of Stratford, 217 F.3d 141, 148, 153-56 (2d Cir. 2000).

To repeat, a plaintiff seeking to establish a Title VII hostile work environment claim must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris, 510 U.S. at 21 (internal quotation marks and citation omitted).  This severe or pervasive standard "has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive

---

the more likely it is that the incidents are related under Morgan.  Judge Calabresi's approach inverts the test such that latter-day conduct that is mild somehow becomes "related" for the very reason that it differs markedly from earlier conduct that is severe.

that environment to be abusive."[6]  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Harris*, 510 U.S. at 21).  Courts review the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris*, 510 U.S. at 23; *see also* *Morgan*, 536 U.S. at 113 (explaining that an employee is not barred "from using . . . prior acts as background evidence in support of a timely claim"); *Fitzgerald v. Henderson*, 251 F.3d 345, 365 (2d Cir. 2001) ("A statute of limitations does not operate to bar the introduction of evidence that predates the commencement of the limitations period but that is relevant to events during the period.").[7]

_____

[6] A Title VII sexually hostile work environment claim further requires a plaintiff to establish that the conduct at issue occurred "because of the plaintiff's sex," *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (per curiam) (internal quotation marks omitted), and that "a specific basis exists for imputing the conduct that created the hostile environment to the employer," *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997).

[7] We read section II of Judge Calabresi's concurring opinion to suggest nothing more than that time-barred conduct may be considered as background evidence in certain circumstances.  As shown by the parentheticals to the citations in the text, we have no quarrel with that suggestion.

McGullam's subjective perception notwithstanding, the sleep-over comment objectively falls short of the requisite levels of severity or pervasiveness. Cf. e.g., Alfano, 294 F.3d 365 (overturning a jury verdict in favor of the plaintiff because the evidence at trial--demonstrating conduct far more egregious than the sleep-over comment in this case--was insufficient as a matter of law to establish a sexually hostile work environment).

Accordingly, the sleep-over comment alone does not present a triable issue regarding McGullam's hostile work environment claim.

**CONCLUSION**

We have considered all of McGullam's contentions on this appeal and have found them to be without merit. Accordingly, the judgment of the district court is hereby **AFFIRMED.**

CALABRESI, *Circuit Judge*, concurring:

I join the majority opinion because I agree with the result it reaches in this case and also with its reasoning,[1] as far as it goes. Specifically, I concur with the majority opinion's two principal holdings: (1) that the only discriminatory conduct that McGullam alleges occurred within the limitations period (*i.e.*, the comments she overheard by a salesman who referred to women as "chickies," and who said of a female friend that "she wasn't worth the trip" "[i]f it wasn't going to be a sleep-over") is insufficiently related to prior alleged discriminatory conduct to be considered part of the same "unlawful employment practice" under 42 U.S.C. § 2000e-5(e)(1) and *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); and (2) that the within-limitations-period comments were neither sufficiently severe nor pervasive enough to establish liability under Title VII.

I write separately, however, to explain my views on the relevance, for the purposes of proving a hostile work environment claim, of discriminatory incidents from outside the limitations period. First, in determining whether incidents and episodes are sufficiently related to constitute a single discriminatory employment practice under *Morgan*, I would consider multiple factors—including the severity of earlier incidents—as part of a totality of the circumstances analysis. The majority opinion implicitly identifies certain factors with which I agree, but my approach requires that I address additional issues that the majority does not consider. Second, I believe that even where prior incidents are not part of the same discriminatory employment practice, and so are excluded by limitations requirements, they nevertheless may provide relevant background evidence to support a claim based on incidents that are within the limitations period. I discuss each issue in turn.

---

[1] I do not join footnote five, which I believe misunderstands the point I am making.

1

I.

A.

In *Morgan*, the Supreme Court explained that hostile work environment claims by "[t]heir very nature involve[] repeated conduct," where liability often is based on "the cumulative effect of individual acts" that are not independently actionable. 536 U.S. at 115. In contrast then to discrete acts of discrimination, a hostile work environment is an "unlawful employment practice" that takes place over time, rather than "on any particular day." *Id.* An "employer may be liable for all acts that are part of this single claim," provided that at least one act that is part of the hostile work environment took place within the applicable limitations period. *Id.* at 118. "A court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Id.* at 120.

What constitutes "the same actionable hostile work environment practice" is, however, hardly self-defining. And the *Morgan* Court's guidance on this question is limited. *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1114 n.6 (9th Cir. 2004) ("*Morgan* itself does not offer precise guidance on how to evaluate whether an act that falls outside the statutory time period can nonetheless be considered for liability purposes."). In providing illustrations to explain its holding—which the majority has quoted in full, s*ee* Maj. Op. at 11—*Morgan* suggested that later incidents will be considered distinct, if they have "no relation" to the earlier acts from outside the period, or if "for some other reason, such as certain intervening action by the employer," the later acts are no longer part of the same hostile environment claim. 536 U.S. at 118. In addition, *Morgan* appeared to endorse the reasoning of the Ninth Circuit Court of Appeals that the pre- and post-limitations incidents were, in that case, part of the same violation

2

because they "'involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers.'" *Id.* at 120 (quoting *Morgan v. Nat'l R.R. Passenger Corp.*, 232 F.3d 1008, 1017 (9th Cir. 2000)); *see also Vickers v. Powell*, 493 F.3d 186, 199 (D.C. Cir. 2007) (indicating that the Supreme Court in *Morgan* gave some direction for determining whether employee complaints are part of the same actionable hostile work environment practice "by approving the lower court's method").

From these tea leaves, circuit courts subsequently have attempted to identify—sometimes explicitly, sometimes implicitly—various factors that should guide the *Morgan* "relatedness" inquiry.[2] For its part, the majority opinion seeks to avoid setting forth general criteria in the interest of preserving "flexibility" for "a context as fact-specific and sensitive as employment discrimination and as amorphous as hostile work environment." Maj. Op. at 16. Even so, by specifying reasons as to why the "sleep-over comment" in this case is insufficiently related to prior conduct that occurred while McGullam worked in the production department at Cedar Graphics, the majority opinion does identify certain distinctions as material. Specifically, in distinguishing between the pre- and post-limitations period incidents, the majority opinion highlights: (1) that they were separated by an intervening action by the employer—McGullam's voluntary transfer—and so took place while McGullam was working for different departments in

---

[2] *See, e.g.*, *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 329 (5th Cir. 2009) (finding pre- and post-limitations conduct sufficiently related to constitute a single "practice" because "[a]s in *Morgan*, the pre- and post-limitations period incidents involved the same type of harassment and were perpetrated by the same manager," but nevertheless concluding that the two periods of harassment were severed by the employer's intervening remedial actions); *Duncan v. Manager, Dep't. of Safety, City & County of Denver*, 397 F.3d 1300, 1309 (10th Cir. 2005) ("To determine whether these acts are part of the same hostile work environment, *Morgan* advises looking at the type of these acts, the frequency of the acts, and the perpetrator of the acts."); *Rowe v. Hussmann Corp.*, 381 F.3d 775, 781 (8th Cir. 2004) ("[W]e conclude as a matter of law that the acts before and after the limitations period were so similar in nature, frequency, and severity that they must be considered to be part and parcel of the hostile work environment that constituted the unlawful employment practice that gave rise to this action.").

different parts of the building; (2) that they were of a different nature, in that many of the pre-limitations period incidents involved lewd comments that were about McGullam personally and were addressed to her or at least intended for her to hear, whereas the post-limitations comments were not (in the view of the majority opinion) lewd and were not directed toward McGullam; and (3) that they were separated by a significant amount of time.

I agree that all of these reasons given by the majority—the commonality of the environment in which the incidents took place (and whether a change in environment is due to intervening action by the employer), the nature of the incidents, and the temporal discontinuity between the incidents—are significantly relevant to assessing whether incidents are part of the same hostile environment claim. I also find helpful some factors that other circuits have attempted to glean from *Morgan*. *See supra* note 1. It is, however, important to appreciate that these considerations are not exhaustive, and that none of them should be considered independently in deciding whether, in any given case, the connection necessary to establish a single hostile work environment exists.

Temporal discontinuity, for instance, clearly does not by itself preclude a finding of relatedness under *Morgan*, 536 U.S. at 118, a point that the majority properly recognizes. *See* Maj. Op. at 19. Similarly, McGullam's transfer to a different department in a different sector of the building is not alone fatal to an argument that the conduct she experienced was part of a single hostile work environment. If, for example, a plaintiff provided evidence tending to show that an entire company, including multiple departments, was permeated with gender-based discriminatory intimidation, ridicule, and insult, and that upper-level management knew of and tolerated this condition, that plaintiff would quite likely be able to establish that the harassment she endured while working in two different departments for that company was part of the same

4

unlawful employment practice. *See Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 386 (7th Cir. 2007) (concluding that the plaintiff had alleged a single hostile work environment claim notwithstanding her change in job assignment—which resulted in her working under new leaders and in a different part of a packaging plant—and that the change in the identity of her harassers was not significant because her Title VII claim was against management for failure to respond to her repeated complaints about her work environment, not against her co-workers).[3]

I do not read the majority opinion as being to the contrary. And the fact that the majority opinion focuses on certain significantly salient differences, between the timely claims and the earlier incidents, to resolve this case need not be read as expressing a view either on the scope of the universe of possibly relevant factors that go into determining relatedness or on the weight any particular factor should be given. In that regard, the majority opinion's approach is much like that of the Supreme Court in *Morgan*, which, after noting some important similarities between the pre- and post-limitations period incidents, concluded simply that it could not say that the pre-limitations incidents were "not part of the same actionable hostile environment claim." 536 U.S. at 121.

It seems to me that what courts are doing without necessarily saying so—and indeed what they should be doing—is considering whether, based on the totality of the circumstances, different incidents are part of the same underlying hostile work environment, both from the viewpoint of the plaintiff and from that of a reasonable person in her position. This is, after all,

---

[3] When the intervening action by the employer was undertaken in an attempt to *remedy* the negative work environment, it might, of course, have greater independent legal significance. *See Stewart*, 586 F.3d at 329 (finding that two periods of alleged harassment were separated by intervening action by the employer in the form of prompt remedial action where the employer reprimanded the harassing supervisor and reassigned the plaintiff away from his supervision). Cedar Graphics does not contend that there was such a remedial purpose underlying McGullam's transfer. The transfer was apparently initiated by McGullam and presented by her to the company as a positive career opportunity.

5

precisely what courts do in deciding the connected question of whether a work environment is, or is not, discriminatorily hostile under Title VII. *See Morgan*, 536 U.S. at 116 ("In determining whether an actionable hostile work environment claim exists, we look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." (internal quotation marks omitted)); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."); *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (indicating that to establish a hostile work environment claim, a plaintiff must show both that she subjectively perceived the environment as abusive and that the environment was objectively abusive, and explaining that a court must analyze these questions by "look[ing] to the record as a whole and assess[ing] the totality of the circumstances").

These factors routinely are used to determine whether the combined effect of various discriminatory incidents is sufficiently severe or pervasive to cause an employee to believe reasonably that her work conditions have been negatively altered—that is, whether a hostile work environment existed. *See Aulicino v. N.Y. City Dep't of Homeless Servs.*, 580 F.3d 73, 82 & n.8 (2d Cir. 2009). But the same factors not only determine whether a person reasonably believes that individual incidents are severe or pervasive enough to amount to discrimination; they also affect whether the incidents are properly viewed as an interrelated part of a course of discriminatory conduct, or are just unpleasant but unconnected events. For instance, frequent

6

discriminatory incidents are more likely, a) to constitute a single employment practice—because a reasonable person will generally consider incidents that are close in time to be connected—and b) to amount to discrimination that is sufficiently pervasive to state a claim under Title VII. Unsurprisingly then, "frequency" has been identified as a significant factor both for determining whether a work environment is unlawfully hostile, *see Harris*, 510 U.S. at 23, and for deciding whether two periods of incidents are part of the same employment practice, *see e.g.*, *Duncan*, 397 F.3d at 1309; *Rowe*, 381 F.3d at 781.

For the same reasons, I believe that the *severity* of alleged conduct affects whether that conduct should be considered "related" under *Morgan*. All other things being equal, incidents that occurred later in time are more likely to be part of the same hostile environment as pre-limitations period incidents when those earlier incidents were more severe. In this respect, consider both the subjective and objective relevance of severity. As to the plaintiff herself, the severity of the earlier statements seems clearly relevant to the question of linkage between incidents. After all, how one reacts subjectively to a later statement—*i.e.*, whether one perceives the statement to constitute part of the same employment practice as prior statements and incidents—certainly depends on the nature, including the severity, of the earlier conduct. Moreover, an objective observer in the plaintiff's position would, I think, consider the relative severity of earlier incidents relevant to her assessment of whether later incidents were related. Where, for example, an individual previously experienced severe harassment, whether in the form of humiliating or obscene comments or even physical threats, a reasonable person is more likely to deem later comments and actions, even if milder, to be part of a pattern than if the earlier episodes were comparatively benign. This is especially likely when the same person or group of people is the source of both the earlier and later incidents. But even where the source is

7

not common, earlier occurrences of severe hostility in the workplace may *reasonably* color one's interpretation of later events and hence whether those events are related.

B.

Adopting this approach, which bases relatedness on the totality of the circumstances including the severity of alleged conduct, requires me to discuss an issue that the majority does not reach: the pervasiveness and severity of the pre-limitations-period conduct that McGullam asserted she endured while working in the production department. In my judgment, the conduct that McGullam alleged during this approximately three-year period would be sufficient, under our cases, to allow a reasonable jury to conclude that McGullam's workplace was "permeated with discriminatory intimidation, ridicule, and insult," causing her employment to be altered for the worse because of her gender. *E.g.*, *Gorzynski*, 596 F.3d at 102; *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003).[4] The majority sets forth most of the comments and actions that were personally directed at McGullam, and I need not repeat them here. *See* Maj. Op at 4-5. In addition, McGullam claims that she witnessed and overheard comments and displays while in the production department that were sexually offensive and demeaning to women generally, including:

> a) a comment by a male manager to another male manager that an (unidentified) woman was "well endowed" and had "double D's"; b) a conversation between McGullam and two male co-workers about a client account McGullam had inherited, where one of the co-workers referred to the contact for that client as "generally a nice lady, except when she's on the rag"; c) comments by the male plant manager and other male employees about a female employee at a sister

---

[4] I do not address the question of whether the alleged harassing conduct that formed the basis of a hostile workplace can be imputed to Cedar Graphics, though on this issue it is notable both that McGullam claims to have made numerous complaints to supervisors about the work environment and that such complaints were generally "fruitless," and also that McGullam implicates managers in the production department in some of the discriminatory conduct. *See Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998) (explaining the ways that liability for a hostile work environment can be imputed to an employer).

company, with several employees speculating that the female employee was "probably 'a dog'" and the manager responding to the contrary that she was "probably beautiful" because "[a]fter all, the bitchier they are, the prettier they are"; d) a male employee "openly" and "constantly" "scratching and adjusting his genitals"; e) a male employee using the phrase "titty bar"; and f) repeated sexually explicit jokes by a particular male employee who every year at Christmas time performed a modified (and sexualized) version of the song "Oh Come All Ye Faithful" while "strok[ing] . . . a large, imaginary penis," and who on another occasion told a joke about having sexual relations with a 7-year-old girlfriend.

These incidents, and those described by the majority, are not exhaustive of McGullam's allegations.

In concluding that McGullam failed to establish a claim for hostile work environment, the district court referred to plaintiff's allegations as amounting to "off-hand remarks" and "jokes" that, though they "may have made Plaintiff uncomfortable," were "not personally insulting, nor . . . obviously intended to intimidate, ridicule, or demean Plaintiff on account of her gender." *See McGullam v. Cedar Graphics, Inc.*, No. 04-CV-2891, 2008 WL 3887604, at *7 (E.D.N.Y. Aug. 20, 2008).[5] I do not believe the record, viewed in its totality, supports this conclusion. McGullam points to several incidents that *were* personally insulting and intended to intimidate, ridicule or demean her, including the comment—made in front of the entire production department— that her "problem" was that she did not "get fucked enough," the comment by a male co-worker that she had a "big fat ass," as well as the "joke" by a male co-worker who said that he wanted "to pump a bullet into [McGullam's] head, right behind [her] ear and blow [her] brains out."

Moreover, these incidents must be considered alongside the other comments, only some of which I mentioned above, that were not directed to or about McGullam, but also contributed to a work environment that was hostile to women. *See Patane v. Clark*, 508 F.3d 106, 114 (2d

---

[5] The district court did not question that McGullam subjectively experienced her workplace as hostile, and on appeal Cedar Graphics has not challenged this.

9

Cir. 2007) ("[A] plaintiff need only allege that she suffered a hostile work environment because of her gender, not that all of the offensive conduct was *specifically* aimed at her."). The district court minimized these statements, claiming that there was "nothing in the record to indicate that the alleged conduct was made on the basis of gender," and that "[a]t best, the evidence here demonstrates that the work environment was equally unprofessional for both men and women." *McGullam*, 2008 WL 3887604, at \*7. This was error.

Certainly, plaintiff, who proceeded *pro se* in this litigation, made multiple allegations about workplace vulgarity and poor manners that are not actionable under Title VII. *See Oracle v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). But many of the comments that McGullam asserts she overheard—including references to one woman as a "dog" and as "bitch[y]," to another woman as being "on the rag," and more generically to a "titty bar"—have obvious gender connotations that a person in plaintiff's position reasonably could understand to be particularly demeaning to women as a group. That this sexually derogatory language was not always directed specifically at McGullam or even necessarily at individual women, and rather appears to be the product of a locker-room office culture that both men and women observed (and in which some women even participated) does not insulate Cedar Graphics from a Title VII hostile work environment claim. *See Petrosino v. Bell Atl.*, 385 F.3d 210, 221-23 (2d Cir. 2004) (explaining that "[t]he mere fact that men and women are both exposed to the same offensive circumstances on the job site . . . does not mean that, as a matter of law, their work conditions are necessarily equally harsh" where a jury could reasonably find that certain offensive comments and materials were particularly offensive to women); *see also Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 810 (11th Cir. 2010) (en banc) ("[A] member of a protected group cannot be forced to endure pervasive, derogatory conduct and references that are gender-

10

specific in the workplace, just because the workplace may be otherwise rife with generally indiscriminate vulgar conduct. Title VII does not offer boorish employers a free pass to discriminate against their employees specifically on account of gender just because they have tolerated pervasive but indiscriminate profanity as well.").

C.

The severity of this pre-limitations period conduct pushes in the direction of finding a single hostile work environment at Cedar Graphics that persisted through McGullam's transfer to the estimating department and extended into the actionable limitations period. A person in McGullam's position, who had previously worked in an office where degrading discussion of women was pervasive and tolerated might understandably construe a salesman's subsequent references to women as "chickies" and his discussion of a girlfriend as not being "worth the trip" if she did not sleep with him as a continuation of the same hostile environment.

Nevertheless, I am ultimately persuaded that, based on the totality of circumstances, these later comments were not part of the same employment practice as the earlier incidents that took place in the production department. The majority properly emphasizes the significance of McGullam's voluntary transfer out of the production department in this case, because that transfer physically separated her from the atmosphere that had been hostile to her and limited (albeit without completely eliminating) her interaction with the employees from that department. McGullam indicated, in both her deposition testimony and in her journal, that the environment in the estimating department was "better," and, as the majority notes, she pointed to no problems with anyone in the estimating department. For these reasons, and for others stated in the majority opinion, I do not believe that the salesman's isolated comments that McGullam overheard approximately a year after her transfer can be considered part of the same employment

11

practice as the harassment from McGullam's time in the production department. As a result, I agree that the earlier harassment was outside the statute of limitations period and, hence, non-actionable.

## II.

Even where incidents from outside of the limitations period are not sufficiently related to within-limitations incidents to be actionable under *Morgan*, they may still be germane to a plaintiff's Title VII claim in a different way. In *Morgan*, the Court held that, in contrast to hostile work environment claims, discrete acts of alleged discrimination, such as termination, failure to promote, or refusal to hire, are not actionable if time barred. 536 U.S. at 113. But, the Court added, this does not "bar an employee from using the prior acts as background evidence in support of a timely claim." *Id.*; *see also Petrosino*, 385 F.3d at 220 (recognizing that plaintiff's claims based on earlier promotion denials were time barred, but determining that "evidence of earlier promotion denials may constitute relevant background evidence in support of a timely claim" and would be so considered (internal quotation marks omitted)). Similarly, alleged incidents that may not be considered for purposes of establishing liability for a hostile work environment, because they occurred outside the limitations period and were not sufficiently related to incidents within that period, nevertheless may be admissible and probative as background evidence to support a claim based on alleged conduct that falls within the limitations period. *See McGinest*, 360 F.3d at 1114 n.6 (endorsing this reading of *Morgan*). It is, therefore, a mistake to assume that incidents that are unrelated under the *Morgan* standard are irrelevant. *But see id.* at 1128 (O'Scannlain, *J.*, concurring in part and dissenting in part).

The meaning of words and actions in the workplace frequently cannot be judged in a vacuum; their meaning may well depend on context. *See Oncale*, 523 U.S. at 81-82 ("The real

12

social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."). Prior incidents, even if they are not part of the same employment practice, can provide such context. Thus, whether an objective observer would consider comments to have gender-discriminatory (or racially discriminatory) connotations, or to be intended to further a pattern of gender or racial discrimination, will not always be obvious, and may depend on circumstantial evidence. *Cf. Holcomb v. Iona Coll.*, 521 F.3d 130, 141 (2d Cir. 2008) (recognizing that direct evidence of discriminatory intent in employment discrimination cases is generally hard to come by, and that plaintiffs must be able to rely on circumstantial evidence). Evidence that similar comments have previously been used by the same individual (or perhaps by others in the company) to harass on the basis of race or gender might well be relevant to how the later comments reasonably could be interpreted. And, significantly, that will be so even if the comments are not part of the same unlawful employment practice under *Morgan* because, for instance, the comments are separated by an important intervening action by the employer and by a substantial amount of time.

In this respect, the *severity* of prior time-barred incidents may also be relevant as background evidence. Subjectively, a female plaintiff who has previously experienced an extremely hostile work environment is more likely to perceive subsequent discriminatory incidents—that, let us assume, take place in a different department within the company, under different managers, and after some gap in time—to create an environment that is hostile to women. Similarly, the severity of such prior incidents is also relevant to an objective observer's assessment of the latter environment. *Objective* judgment may more readily discount the earlier

13

severe hostility, but at least in some circumstances, such severe hostility may still be determinative.

Ultimately, I do not think that in the case before us the pre-limitations conduct affects the result. Even if the production department conduct is considered as background evidence, and is deemed as severe as I take it to be, the "sleep-over comment" (whether or not it is combined with the "chickies" comments) is not adequate to survive summary judgment. In other cases, however, evidence from outside the limitations period pertaining to conduct that is no longer actionable might well make a difference in establishing the validity of a plaintiff's timely claims.